# IMPORTANT NOTICE
# <u>NOT TO BE PUBLISHED OPINION</u>

THIS OPINION IS DESIGNATED "NOT TO BE PUBLISHED."
PURSUANT TO THE RULES OF CIVIL PROCEDURE
PROMULGATED BY THE SUPREME COURT, CR 76.28(4)(C),
THIS OPINION IS NOT TO BE PUBLISHED AND SHALL NOT BE
CITED OR USED AS BINDING PRECEDENT IN ANY OTHER
CASE IN ANY COURT OF THIS STATE; HOWEVER,
UNPUBLISHED KENTUCKY APPELLATE DECISIONS,
RENDERED AFTER JANUARY 1, 2003, MAY BE CITED FOR
CONSIDERATION BY THE COURT IF THERE IS NO PUBLISHED
OPINION THAT WOULD ADEQUATELY ADDRESS THE ISSUE
BEFORE THE COURT. OPINIONS CITED FOR CONSIDERATION
BY THE COURT SHALL BE SET OUT AS AN UNPUBLISHED
DECISION IN THE FILED DOCUMENT AND A COPY OF THE
ENTIRE DECISION SHALL BE TENDERED ALONG WITH THE
DOCUMENT TO THE COURT AND ALL PARTIES TO THE
ACTION.

RENDERED: January 24, 2008
NOT TO BE PUBLISHED

**Supreme Court of Kentucky** FINAL

2007-SC-000115-WC

DATE 2-14-08 ExAGrouthe.

BOYD FELTNER                                                    APPELLANT


                    ON APPEAL FROM COURT OF APPEALS
V.                          2006-CA-001070-WC
                    WORKERS' COMPENSATION NO. 04-01247


RICHARD D. VANDUZER,
UNINSURED EMPLOYERS' FUND
HON. A. THOMAS DAVIS, ADMINISTRATIVE
LAW JUDGE AND WORKERS' COMPENSATION BOARD          APPELLEES


### MEMORANDUM OPINION OF THE COURT

### AFFIRMING

An Administrative Law Judge (ALJ) determined that Richard Vanduzer (the claimant) was Boyd Feltner's employee, that he sustained work-related injuries, and that his average weekly wage was $250.00. The Workers' Compensation Board affirmed the decision, and the Court of Appeals affirmed the Board. Convinced that substantial evidence supported the decision and that the ALJ complied with KRS 342.140 when determining the claimant's average weekly wage, we affirm.

The employment history included with the claimant's application for benefits stated that he had worked on various unspecified construction jobs since the 1980s. It listed only four specific employments: self-employed carpentry handyman (May to November 2002), server for Applebee's (November 2002 to March 2003), carpenter for

TLC Construction (March to May 2003), and carpenter for Feltner (June 15 to July 25, 2003, the date of the alleged injury). Records from the emergency room at Hazard Appalachian Regional Hospital indicated that the claimant presented on July 25, 2003, with bilateral wrist fractures. He reported that he had fallen about twelve feet from a ladder that morning, while working as a carpenter, and that he had landed on his wrists. Medical records indicated that he underwent bilateral wrist surgery twice. An ALJ determined ultimately that the injuries caused a 19% permanent impairment rating.

Felter had no workers' compensation insurance, so the Uninsured Employers' Fund was joined as a party. Feltner's claim denial asserted that he had no employees on the date of the alleged injury. Among the contested issues presented to the ALJ were: the existence of an employment relationship, whether the injuries were work-related, and the claimant's average weekly wage.

When deposed on January 4, 2005, the claimant testified that he had worked for Feltner on two occasions. On the first occasion, they poured concrete together in Lexington. The accident occurred on the second occasion. The claimant stated that he and Feltner had been working on a building for about two months when the accident occurred and that individuals named Raymond and Eddie witnessed it.

The claimant testified at the hearing that he had worked for Feltner previously and that they spoke on the telephone frequently when he did so. He stated that in 2002 and 2003 he used his "home phone." It was listed in the name of Sandra Clark, who now was his ex-wife. He confirmed that he had filed into evidence telephone records from 2002 that listed multiple phone calls from his home phone to Feltner's phone number. He also testified that he had worked for Feltner before 2002, for a company

2

named Wright Construction. The claimant stated that Feltner was present when the accident occurred, that Feltner took him to the hospital, and that Feltner sent Raymond Burton to the hospital that evening to bring him his pay. He testified that he had worked for Feltner for nearly three months and that Feltner paid him weekly, in cash, at the rate of eight dollars per hour. He stated that he earned $320 per week and did not know why his Form 101 application listed $250 as his average weekly wage because he worked for forty hours per week except when it rained. Feltner called him on those occasions. At other points, he testified that he averaged $250 per week and that he earned $400 in his best week. The claimant testified that he did not ask Feltner to pay his medical bills because the hospital informed him that Feltner denied his employment.

The claimant denied on cross-examination that he had ever used an alias until confronted with documents indicating that he was convicted in Florida for cocaine possession and used a fictitious name when arrested. Asked why he failed to include Wright Concrete or any employer before May 2002 on his employment history, he stated that he did not remember working for Wright Concrete when he completed the form and that he could not recall the names of any of the other previous employers. Questioned about documents that his ex-wife filed in their divorce proceedings, he stated that he did construction work but did not know why she characterized it as being part-time seasonal work. He stated that he did not file a tax return for 2003 and did not know how much he earned. Confronted with numerous inconsistencies in his hearing and deposition testimonies, he stated that he did not recall his deposition and that he hit his head when he fell from the ladder and had problems with his memory.[1]

---

1 The emergency room records refer to the wrist injuries but do not mention a head injury. Other evidence refers to a subsequent hospitalization for alcohol withdrawal.

3

Barbara Taylor testified that she knew the claimant because her son and his step-son attended the same school and played sports together. The claimant did some odd jobs for her, such as mowing grass, and they became friends. She testified that he was working on a building known as the Wildcat Auction House in July 2003, and that she and her son took ice water to him occasionally at the worksite. He told her that he was working for Feltner. When she visited him in the hospital after the accident, he explained how it occurred and told her that Feltner took him to the hospital. She stated that she saw the claimant being paid in cash on one occasion and that she did not know Feltner or Raymond Kilburn. In the four or five years that she had known the claimant, he had worked for Applebees, Mike White, Donnie Webber, and Feltner and had also done odd jobs.

Feltner testified that Raymond Kilburn hired him to build a barn and agreed to pay him $13,005.00. They thought that the job would take four to six months and based the figure on $15.00 per hour for Feltner's labor, with Kilburn supplying the materials and what extra labor was needed. He stated that he, Kilburn, and Kilburn's two helpers did all of the work and that he did not hire the claimant to work on the building. He stated that the barn was only partially completed when they quit and that he would work on it again if requested. Feltner denied that he had ever employed the claimant and explained that he had denied knowing him initially because the claimant had used a different name when both of them worked for Wright Concrete in Pikeville in 2001. He stated that he had neither seen nor talked with the claimant since then. Feltner denied taking the claimant to the hospital and maintained that he first heard of the alleged incident when someone at the Office of Workers' Claims contacted him. He

4

testified that he had a brother, Charles Eddie (known to some people as Ed) but stated that Ed had not helped with the barn. He stated that an individual named Raymond Burton had helped him pour a ring wall for a water tank in 2004.

Raymond Kilburn testified that he and Feltner had a written contract regarding the construction of a pole barn for his auction house. He agreed to provide the materials and to pay Feltner $13,005 for working and overseeing the construction. He thought that it worked out to about $10 per hour. He stated subsequently that they began working on the barn in June 2003 and that they quit sometime in September 2003. Kilburn testified that he did not know the claimant and that he, his son, and his son-in-law were the only individuals who worked with Feltner on the barn. He admitted, however, that usually he worked late in the day, after Feltner left the site. Kilburn stated that he paid Feltner by check at irregular intervals. He denied knowing the claimant and denied knowing that anyone had been injured at the site. Appended to Kilburn's deposition were copies of checks made payable to Feltner and bearing the notation "labor," "labor on building," or "labor - contract." The dates and amounts of the checks were as follows: June 6, 2003, $2000; June 13, 2003, $2000; June 21, 2003, $2000; June 27, 2003, $2000; July 25, 2003, $2000; August 5, 2003, $1000, and August 8, 2003, $2005. The last check bore the notation "Pd in Full - contract labor." Kilburn stated that the barn was only partially finished but that he was able to hold auctions in part of it. He hoped to complete it later.

Raymond Kilburn's son, Dwight Kilburn, testified that he worked on the barn occasionally. The only others that he knew were working on the barn were his father, brother-in-law, and Feltner. He stated that he did not know the claimant.

5

Feltner's son, Charles Feltner, testified that he worked with his father for Wright Concrete in 2001. He stated that he did not know the claimant.

Thomas Teague of CLT Construction testified that he employed the claimant for a few weeks in 2001 before firing him. He stated that he paid the claimant $9.00 to $10.00 per hour, in cash. Teague also stated that he had known Feltner and Raymond Kilburn for years but had never known either of them to employ the claimant.

The claimant filed into evidence telephone records from 2002, which listed 24 calls from a telephone listed for the residence of Sandra Clark to Feltner's home. Feltner's telephone records from 2003 listed two short calls, made at 8:23 p.m. and 8:25 p.m. on July 2, 2003, from his home to Sandra Clark's number. Also in evidence was the decree that dissolved the claimant's marriage to Sandra Clark on September 19, 2003. It stated that the parties were separated and living apart as of June 26, 2003.

After summarizing the evidence, the ALJ acknowledged the presence of many contradictions and inconsistencies in the claimant's testimonies. The ALJ also noted inconsistencies between Feltner's testimony and other evidence in the record. Convinced that the medical and telephone records were more credible than their testimonies, the ALJ chose to afford the documentary evidence greater weight. The ALJ noted specifically that the claimant testified to severe memory problems, that the work history he submitted was suspect or incomplete, and that it appeared that he spent a portion of his work life in illegal activities. The ALJ also found a lack of credibility in Feltner's assertions that he neither knew nor hired the claimant to work for him. Emergency room records indicated that the claimant fell from a 12-foot ladder while working, that the fall broke his wrists, and that he went to the emergency room

6

immediately. Telephone calls made less than a month before the injury from Feltner's home to the Sandra Clark residence tended to discredit Feltner's assertions. So did the calls made from the Clark residence to Feltner during the period from April to June 2002. The ALJ found Feltner's and Kilburn's sons not to be reliable witnesses regarding the alleged employment relationship because they were not at the job site on a regular basis. The ALJ acknowledged that Feltner may not have been familiar with the name under which the claimant filed his application for benefits but was convinced that Feltner knew the claimant and employed him. Relying on Ms. Taylor's testimony that she witnessed the claimant being paid in cash and noting that Mr. Teague's testimony also indicated that construction laborers were paid in cash, the ALJ determined that the claimant received cash at the rate of $8.00 per hour and earned $250.00 per week. Appealing, Feltner asserts that no substantial evidence supported the finding of an employment relationship or of a $250.00 average weekly wage.

As stated in Roark v. Alva Coal Corporation, 371 S.W.2d 856 (Ky. 1963), and numerous other decisions, an injured worker bears the burden of proving every element of a claim. Because KRS 342.285 designates the ALJ as the finder of fact with the sole authority to weigh the evidence, the ALJ has discretion to determine the quality, character, and substance of evidence and to decide whom and what to believe. Addressing the standard of review on appeal, Special Fund v. Francis, 708 S.W.2d 641, 643 (Ky. 1986), explains that a decision favoring the party with the burden of proof may not be disturbed if substantial evidence supports it. In other words, the decision must be reasonable under the evidence.

Attacking the finding of an employment relationship, Feltner points to numerous

7

inconsistencies in the claimant's testimonies as well as to his felony conviction and use of aliases, his history of alcohol abuse, and his failure to submit certain evidence. Feltner asserts on that basis that the claimant was not a credible witness. He also asserts that Ms. Taylor was a biased witness. He notes that some of her testimony conflicted with the claimant's regarding his work history and concludes that the claimant's self-serving testimony, the emergency room records, and the telephone records do not constitute substantial evidence to support a finding that Feltner was his employer at the time of the injury. We disagree.

Nothing indicated that Ms. Taylor's testimony was so biased as to be unreliable, and Feltner has pointed to nothing that required the ALJ to disregard it. The history noted on the emergency room records indicates that the claimant landed on his wrists when he fell from a 12-foot ladder while working. Uncontradicted evidence indicated that the claimant and Sandra Clark were married and lived together in 2002 and that a telephone at their residence was listed in Clark's name. Telephone records document numerous calls made in 2002 from their residence to Feltner's residence and no evidence indicated that someone other than the claimant had reason to call Feltner from that number in 2002. Two calls made less than a month before the accident from Feltner's residence to the Sandra Clark number, and no evidence indicated that Feltner had reason to call that number twice on July 2, 2003, except to contact the claimant. Regardless of whether the claimant and Clark separated in June 2003, the telephone records tended to contradict Feltner's testimony that he had had no contact with the claimant since several years before the accident. Together with the emergency room records and Ms. Taylor's testimony, they permitted a reasonable inference that the

8

claimant was probably truthful in testifying that he broke his wrists while working for Feltner on July 25, 2003.

Feltner complains that no tax returns, W-2 forms, or 1099 forms verified the claimant's wages. Attacking the claimant's credibility, Feltner asserts that not a scintilla of evidence supported the finding that he earned an average weekly wage of $250. He also asserts that the claimant was, at best, a seasonal employee whose wage must be determined under KRS 342.140(2). Again, we disagree.

KRS 342.140(2) applies to "occupations which are exclusively seasonal and therefore cannot be carried on throughout the year." The claimant acknowledged that he had worked for many different employers for short periods of time, but relevant for the purposes of KRS 342.140(2) was that he was injured while performing construction carpentry. Nothing indicated that construction carpentry is an occupation that is exclusively seasonal and therefore cannot be carried on throughout the year in Kentucky. Therefore, the ALJ did not err in failing to apply KRS 342.140(2).

KRS 342.140 does not require a worker's earnings to be documented with tax returns, W-2 forms, or 1099 forms. Fawbush v. Gwinn, 103 S.W.3d 5, 10 (Ky. 2003), explains that when an injury is sustained in an employment of less than 13 weeks' duration, KRS 342.140(1)(e) bases the average weekly wage on what the injured worker would have been able to earn in the same employment had it existed for a full 13 weeks before the injury occurred. It estimates the worker's earnings based on those of an individual who performed similar work for the same employer during the 13 weeks that immediately preceded the injury. Fawbush indicates that when such information is not available, the ALJ must estimate a realistic wage by drawing reasonable inferences

9

from the evidence that is available.

The claimant testified that Feltner paid him $8 per hour and that he worked 40 hours per week unless it rained, which would have yielded an average weekly wage of $320. He also testified that he probably averaged $250 per week, which was consistent with his application for benefits. Teague testified that he paid the claimant $9 to $10 per hour when the claimant worked for him. Thus, a finding that the claimant earned an average weekly wage of $250 was reasonable under the evidence.

The decision of the Court of Appeals is affirmed.

All sitting. All concur.

COUNSEL FOR APPELLANT,
BOYD FELTNER:

STEPHEN N. CALVERT
19 COURT STREET
P.O. BOX 554
CAMPTON, KY 41301


COUNSEL FOR APPELLEE,
RICHARD D. VANDUZER:

MCKINNLEY MORGAN
MORGAN, MADDEN, BRASHEAR & COLLINS
921 SOUTH MAIN STREET
LONDON, KY 40741

COUNSEL FOR APPELLEE,
UUNINSURED EMPLOYERS' FUND:

ROBERT W. HENSLEY
ASSISTANT ATTORNEY GENERAL
UNINSURED EMPLOYERS' FUND
1024 CAPITAL CENTER DRIVE MESSENG
FRANKFORT, KY 40601-8204